## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DIGITAL ALLY, INC.,

       Plaintiff,

       v.                          Case No. 2:22-cv-02203-HLT-ADM

CULP MCAULEY, INC., et al.,

       Defendants.

### MEMORANDUM AND ORDER

This is a contentious breach-of-contract case. Plaintiff Digital Ally, Inc. has sued a corporation and four individuals for breaching agreements about health protection equipment. Plaintiff seeks both monetary and equitable relief for its claims and seeks a preliminary injunction preventing Defendants from disposing of the property acquired as part of the agreement or spending the remaining funds Plaintiff provided to Defendants. Doc. 4. Because Plaintiff has not shown that it will suffer irreparable harm or that it is substantially likely to prevail on its claims, the Court declines to issue an injunction and denies the motion for preliminary injunction.

## I.      BACKGROUND[1]

### A.      Parties

Plaintiff is a company that specializes in video equipment and software for law enforcement agencies, commercial fleet companies, and event security teams. Doc. 1 at ¶ 4; Doc. 5 at 3. During the pandemic, Plaintiff altered its business to sell health protection equipment. Doc. 5-2 at ¶ 3.

---

[1]    The following facts are alleged in the verified complaint, its exhibits, and in the exhibits submitted with the preliminary-injunction briefing. The Court has also considered the evidence and testimony presented at the June 29, 2022 preliminary-injunction hearing.

Defendant Culp McAuley, Inc. ("Culp McAuley") is a "management consulting services business within the engineering, accounting, research, and management services sector." Doc. 1 at ¶ 5. It supplies personal protective equipment ("PPE") and COVID-19 test kits. Doc. 15 at 6. Culp McAuley is approved by the federal government to supply medical gloves to government entities. Doc. 18-1 at ¶ 4. Defendants Brandon Culp and Campbell McAuley are co-founders of Culp McAuley. Defendant Mark Depew is the registered agent and treasurer of Culp McAuley. Defendant Larry Roberts is the incorporator of Culp McAuley and operator of a trust account where the relevant funds were deposited. Doc. 1 at ¶¶ 5-9.[2]

### B.    Venture Agreement

In the fall of 2021, Stanton Ross, who is Plaintiff's CEO, began discussing a business opportunity with Depew in which Culp McAuley would "facilitate the purchase, inspection, shipment, and/or sale of nitrile gloves" with funding from Plaintiff. Doc. 5-2 at ¶ 4. Ross testified at the hearing that Culp McAuley indicated it had a government contract to sell gloves. Plaintiff also sought to have Shield-branded gloves manufactured. Doc. 18-1 at ¶ 7. The Shield brand is a proprietary mark that belongs to Plaintiff. Doc. 1 at ¶ 20.

On September 22, 2021, Plaintiff and Culp McAuley entered into a venture agreement. Doc. 1-1 at 2. The venture agreement essentially has two parts. First, Plaintiff agreed to submit purchase orders to Culp McAuley to purchase non-Shield branded nitrile gloves in an amount not to exceed $2.5 million. Second, Plaintiff would submit purchase orders for Shield-branded nitrile gloves in an amount not to exceed $1.5 million. *Id.* at 2-3. The gloves were to be sold by Plaintiff or by Culp McAuley as Plaintiff's sales representative. *Id.*[3] Prepayment for any purchase order

---

[2]    The Court will refer to Defendants collectively except where distinction is warranted.

[3]    Defendants contend that only Plaintiff could sell the Shield-branded gloves. Doc. 15 at 8. But the venture agreement states that the Shield-branded gloves "may be sold by [Plaintiff] or by [Culp-McAuley] as a sales representative of [Plaintiff]." Doc. 1-1 at 3. The purchase order for the Shield-branded gloves also states that

was to be made to a trust account managed by Roberts. *Id.* There was a designated profit split for both types of gloves, but Culp McAuley was also to receive a 25% markup on the Shield-branded gloves. *Id.* at 2-4. The venture agreement stated that it "constitutes the intent of the parties," and that "neither of the parties are subject to any binding agreements, obligations or responsibilities, except as set forth in definitive agreements to be executed by the parties." *Id.* at 4. The terms and conditions also included the following obligations for Culp McAuley ("Seller") and Plaintiff ("Buyer"):

> Seller will use all reasonable efforts to comply with Buyer's shipping instructions as they are communicated from time to time[.] The parties agree that legal title shall pass to the Buyer upon payment to/from the Legal Trust account described in item 1 above. Seller is required to provide adequate insurance on the Products at all times and have risk of loss until such time as the Buyer shall notify Seller that it has sold the underlying Product. The Products will be held in Seller's warehouse at the direction of the Buyer until such time as the Buyer communicates shipping instructions. All costs of warehousing and insurance will be at the cost of the Seller[.] Buyer is not responsible for any duty or customs fees.

*Id.* at 6. Under the terms and conditions, Kansas law governs. *Id.* The parties to the venture agreement (Plaintiff and Culp McAuley), *id.* at 2, agreed to resolve disputes in either Kansas state or federal court and to submit to jurisdiction and venue in those courts, *id.* at 6.

### C.   Purchase Order 1

The same day the parties executed the venture agreement, Plaintiff submitted a purchase order for 104,166 boxes of Cardinal Health Flexal Touch gloves for a price of $2,499,984 ("Purchase Order 1"). Doc. 1-2 at 2. Purchase Order 1 listed the delivery date as "Urgent Delivery." *Id.* Under the terms and conditions of Purchase Order 1, it is "irrevocable upon the occurrence of

---

"[s]ome product might be shipped to and stored at a Culp McAuley warehouse for sales performed by Culp McAuley." Doc. 1-4 at 3.

the prepayment of funds into the Legal Trust account and Buyer's receipt of a corresponding sales/purchase order from Culp & McAuley, Inc., the receipt of which is hereby acknowledged, and the terms of which are acceptable to the Buyer." *Id.* at 3. Plaintiff wired the money to the trust account managed by Roberts. Doc. 1-3; *see also* Doc. 1 at ¶¶ 17-19. Plaintiff did not intend for the gloves to be shipped to its business but rather intended Culp McAuley to sell them and share the revenue as outlined in the venture agreement. Doc. 5-2 at ¶ 6. Plaintiff believed that Culp McAuley had an existing government contract for certain products, including nitrile gloves, and that the gloves could quickly be sold. *Id.* Plaintiff expected profit in a matter of days or weeks. *Id.*

According to Defendants, however, shortly after the parties executed Purchase Order 1, the market for PPE began to cool and price-per-box of Cardinal Health Flexal Touch gloves dropped. Doc. 18-1 at ¶¶ 13-14. Using its best efforts, Culp McAuley was only able to procure $247,500 worth of the Cardinal Health Flexal Touch gloves, or approximately 11,000 boxes. *Id.* ¶ 12. To salvage the profit margin, Defendants argue that the parties agreed that Culp McAuley would use the remaining funds to purchase different PPE products with stronger profit margins. *Id.* ¶ 14.

Culp McAuley used some of the funds to purchase 89,400 respirator masks and 16,290 boxes of Cranberry Evolve gloves that were not requested by Plaintiff in Purchase Order 1. Doc. 1 at ¶ 48; *see also* Doc. 5-3 at ¶ 22. According to Defendants, these other items were the products the parties agreed to purchase when the price-per-box on the Cardinal Health Flexal Touch gloves dropped. Doc. 18-1 at ¶ 14. But some of these items were purchased before or shortly after the parties executed Purchase Order 1. Doc. 20-1 at 3-6. Of the $2,499,984 transferred in connection with Purchase Order 1, $862,722.50 has been spent, leaving approximately $1.6 million unspent. Doc. 5-3 at ¶ 23; *see also* Doc. 18-1 at ¶ 14. McCauley testified at the hearing that he did not know the current balance of the trust account.

In December 2021, Culp McAuley approached the federal government about the government purchasing various types of PPE, including the masks and Cranberry Evolve gloves. Doc. 18-1 at ¶ 15. The government agreed. *Id.*[4] Culp McAuley conveyed this to Plaintiff on December 30, 2021, but Plaintiff told Culp McAuley not to sell any of the products until the government contract was finalized. *Id.* ¶ 16; *see also* Doc. 18-15.

**D.      Purchase Order 2**

On November 10, 2021, Plaintiff sent a second purchase order ("Purchase Order 2"). Doc. 1-4 at 2. Purchase Order 2 requested 240,000 boxes of Shield-branded gloves for a total of $1,416,000.[5] *Id.* According to Defendants, Plaintiff had previously tried to have nitrile gloves manufactured under the Shield brand, but Plaintiff had been disappointed with the quality. Doc. 18-1 at ¶ 22. However, Culp McAuley was able to facilitate the manufacture of gloves that would meet or exceed the FDA's requirements, which allowed them to be sold as medical grade gloves suitable for use as PPE. *Id.*

The due date for Purchase Order 2 was March 1, 2022. Doc. 1-4 at 2. Plaintiff wired $1,500,000 (the cost of the gloves plus an additional $84,000 as a gesture of goodwill and to assist with shipping costs, *see* Doc. 5-2 at ¶ 8) to Roberts. Doc. 1-5 at 2; *see also* Doc. 1 at ¶¶ 20-28. The Shield-branded gloves were to be shipped to Plaintiff,[6] but either party could sell them and both parties would share the revenue. Doc. 5-2 at ¶ 10.

---

[4]   The testimony about Culp McAuley's contract with the government was not clear. There is evidence Culp McAuley represented that it had a government contract before the parties entered their arrangement, but it is not clear whether this purported contract is the same one that arose in December 2021, or the same one Culp McAuley is waiting on now.

[5]   Purchase Order 2 inadvertently listed Culp McAuley as the manufacturer. But the parties agreed and confirmed that Culp McAuley was not the manufacturer. Doc. 1 at ¶¶ 27-28.

[6]   There is some dispute about where the gloves were to be shipped, and whether Plaintiff wanted them shipped to Kansas. Purchase Order 2 included some additional notes. One provided for "[s]hipping from the manufacturer in Malaysia to Digital Ally dock in Lenexa, Kansas to be managed by Culp McAuley." Doc. 1-4 at 3. But another note stated that "[s]ome product might be shipped to and stored at a Culp McAuley warehouse for sales performed

Defendants contend the parties agreed that Culp McAuley would enter a six-month production contract to supply Shield-branded gloves to Plaintiff. Doc. 18-1 at ¶ 23. Defendants argue that Purchase Order 2 was intended to cover the initial order of gloves—one-month of the six-month deal—and that Plaintiff would fund the remainder of the order. *Id.* ¶¶ 23, 28. Culp McAuley subsequently contracted with Encompass Industries, a Malaysia-based manufacturer, to produce 1,536,000 boxes of Shield-branded gloves over a six-month period. *Id.* ¶ 25; *see also* Doc. 18-9. The value of this production was $9,062,400, and Culp McAuley convinced Encompass to manufacture the Shield-branded gloves on credit by leveraging its relationship with Encompass and its reputation in the PPE industry. Doc. 18-1 at ¶ 26. According to Defendants, Plaintiff agreed to this plan and verbally committed to pay for the six-month manufacturing contract. *Id.* ¶ 27. Encompass subsequently completed the six-month manufacturing contract, and the Shield-branded gloves are currently in a Culp McAuley warehouse.[7] *Id.* ¶ 29. According to Defendants, Plaintiff has only paid for the first month of manufacture, or 1/6 of the Shield-branded gloves, and is refusing to pay the remaining amounts, shipping or storage costs, or Culp McAuley's 25% markup fee. *Id.* Defendants contend Plaintiff's actions are jeopardizing Culp McAuley's relationship with Encompass. *Id.*

Plaintiff argues that Purchase Order 2 is limited to its specific terms and that it never "encourage[d] Defendants to bind themselves in connection with Purchase Order 2 by agreeing to purchase $9,062,400 worth of Shield-branded gloves." Doc. 20 at 9. Plaintiff attaches to its reply a February 2, 2022 proposal by Culp McAuley for the six-month deal. Doc. 20-2. But Plaintiff

by Culp McAuley." *Id.* Plaintiff maintains it has sought shipment to Kansas, but Ross also testified that he did not request shipment to Kansas because he thought Culp McAuley would sell the gloves to the government.

[7] The record is a little unclear on whether all the Shield-branded gloves are in the Culp McAuley warehouse or if some portion remains in transit.

argues that "[n]owhere in this document can it be suggested that Plaintiff agreed to such a proposal . . . ." Doc. 20 at 9. Nor have Defendants produced any signed agreement or sales purchase agreement. *See* Doc. 20-2 at 5. However, the proposal was sent to Ross, Plaintiff's Vice President of Engineering Douglas Fletcher, and another executive of Plaintiff. *Id.* at 2. Ross testified that he doesn't recall seeing this email, but he was unaware of any writing or statement by Plaintiff that disavowed that agreement. And in a May 2, 2022 email, Fletcher asked Depew to confirm the 6-month order for Shield-branded gloves. Doc 18-14 at 2. There's also evidence in the record that Plaintiff sought to transfer the unused funds associated with Purchase Order 1 to Purchase Order 2, which suggests Plaintiff intended to purchase more than the initial $1,500,000 worth of Shield-branded gloves.

### E.   Communications Between the Parties

Throughout early 2022, the parties communicated about the status of the orders. Doc. 1 at ¶¶ 29-33. Ross provided an affidavit that stated that it "became clear early on that Culp McAuley would be unable to make any timely performance under Purchase Order 1," but that Plaintiff was "optimistic that Culp McAuley would perform under Purchase Order 2." Doc. 5-2 at ¶¶ 11-12. On January 14, 2022, Plaintiff received samples consisting of eight cartons of the Shield-branded gloves ordered in Purchase Order 2. Doc. 1 at ¶ 29. The samples "looked great" and Plaintiff followed up on the container shipments. *Id.* ¶ 30. Throughout February and March, Depew gave Plaintiff updates. *Id.* ¶¶ 30-33.

On March 29, 2022, Plaintiff and Culp McAuley had a call and Culp McAuley indicated it had a problem with its operational cash flow. *Id.* ¶ 43. Culp McAuley also disclosed that it purchased approximately 400,000 more packages of Shield-branded gloves than the original amount stated in Purchase Order 2. *Id.* By March 30, 2022, at least six containers had cleared

customs and two more were in Seattle awaiting customs. *Id.* ¶ 45. Fletcher inquired if the shipments would be sold soon. *Id.* ¶ 46. He also stated:

> The cash flow of this – from our discussion yesterday, I believe you are planning/hoping that the money realized from the sales will be able to be used for the ongoing flow of 48 containers worth of gloves and not just the 8 we committed to on a PO and prepaid. I believe seeing documentation of the selling price and quantity sold in the coming weeks will improve your position to have us agree to that. The complicating factor to the above is the $2.5M payment for the Cardinal gloves in September and still being open. Hopefully, there will be a positive update on this very soon.

*Id.* Depew responded that he wasn't sure when the shipments would be sold but hoped to have an update in the coming days. *Id.* ¶ 47.

On April 8, 2022, Ross visited Culp McAuley's California warehouse. *See id.* ¶ 49. According to Ross, the gloves were stored without climate control and in conditions that potentially could reduce the shelf-life of the gloves. *Id.* Plaintiff believes that problems with the Shield-branded gloves, including "delays, inability to demonstrate certification, damage from heightened temperature, etc." will be imputed to the Shield brand and will harm Plaintiff. Doc. 5-2 at ¶ 14.

On April 27, 2022, Fletcher emailed Depew and inquired about the Shield-branded gloves as well as the gloves ordered as part of Purchase Order 1. Doc. 5-3 at ¶ 23. He included an inventory and cost summary for the funds spent from the trust account and stated he wanted "to explore shifting the unallocated money in the $2.5M PO to the Shield brand nitrile gloves,"[8] and "[a]lso, the same for any of the $862K that is sold." *Id.*; Doc. 18-16 at 1-2. Depew provided an update on the status of the various containers and stated that he "should have pick up dates for the $2.5 m

---

[8]   This apparently references the approximately $1.6 million left in the trust account transferred as part of Purchase Order 1.

products and the Shield gloves to share with you by Monday." Doc. 5-3 at ¶ 24; Doc. 18-16 at 1. As for "shifting money," Depew stated that Culp McAuley needed an email from Ross confirming that Plaintiff wished to do that. Doc. 18-16 at 1. Depew also asked Ross, who was copied on the email, to "please call to discuss the email as well as finalize the splitting of commissions first thing in the morning as these products could all be picked up next week." *Id.*

On May 2, 2022, Fletcher wrote to Depew to confirm that only $247,500 of the funds in the trust account had been used for the Cardinal Health Flexal Touch gloves referenced in Purchase Order 1, and that $612,172.50 of the funds had been spent on other items. Doc. 5-3 at ¶ 25. This left approximately $1.6 million unspent. Doc. 18-14 at 2. He asked when those products would be "picked up and be considered sold." *Id.* Regarding Purchase Order 2, Fletcher asked to confirm the inventory in Culp McAuley's warehouse, the amount in transit, and the amount on order. *Id.* Fletcher also asked Depew to "Please confirm ICPO# CM022022 dated 2/2/2022 from Culp McAuley for 250,000 Shield Nitrile Gloves (100ct)/month for 6 months (1,500,000 total) @$9.00 = $13,500,000." *Id.* Fletcher also proposed canceling the remaining funds on Purchaser Order 1 and issuing a new purchase order for Shield-branded gloves. *Id.* Defendants contend that Plaintiff tried to unilaterally change the terms of the venture agreement so that Culp McAuley would no longer be entitled to the 25% markup on the Shield-branded gloves. Doc. 18-1 at ¶ 20.

Depew responded that the "numbers are off" and further stated: "We have almost $5 million of gloves landed or on the way and you have only given us $1.5 million. You need to pay for these gloves. The $200,000 is a very small amount of what is owed." Doc. 18-14 at 1. The next day, Depew sent another follow up message stating:

> We acknowledge your request of transferring the balance of the $2.5 million. Let us get correct accounting, including shipping[,] storage, etc.

> Regarding Sheilds, [sic] you have a spread sheet from last week. We will compile all expenses. In our agreement we were to be paid all costs up front, including manufacturing, shipping and transport fees. Also, we were to be paid 25% of manufacturing for our services. If you do this, we would then split the balance 50/50.
>
> If you don't want to pay this then your share of profit would be 15-20%. We never agreed to finance this for you.
>
> Lastly, I need to remind you that the $2.5 is a nonrefundable PO. Campbell is doing you a favor.

*Id.* Since this message, Fletcher has not received any information challenging the accuracy of Plaintiff's expense figures. Doc. 5-3 at ¶ 27.

**F.    Litigation**

Plaintiff filed this case on May 31, 2022. It asserts eight claims. Claims 1 and 2 are for breach of contract and breach of the implied covenant of good faith and fair dealing as to Purchase Order 1. Doc. 1 at ¶¶ 50-62. Claims 3 through 6 are for breach of contract and breach of the implied covenant of good faith and fair dealing as to Purchase Order 2, both for monetary damages and specific performance. *Id.* ¶¶ 63-82. Claim 7 is for replevin of the 11,000 boxes of the Cardinal Health Flexal Touch gloves related to Purchase Order 1. *Id.* ¶¶ 83-87. Claim 8 is for conversion of property related to the 89,400 respirator masks and 16,290 boxes of Cardinal Evolve gloves purchased with the funds transferred as part of Purchase Order 1. *Id.* ¶¶ 88-91.

Plaintiff also moves for a preliminary injunction. Doc. 4.[9] Plaintiff seeks to enjoin Defendants from (1) "disposing of or otherwise harming property" purchased through the purchase orders sent by Plaintiff to Defendants, and (2) "transferring, comingling, or further spending the $3,999,984 paid in connection with the Purchase Orders . . . ." *Id.* at 1.

---

[9]    Plaintiff originally also sought a temporary restraining order, but it agreed to proceed under a preliminary-injunction format during a status conference. Doc. 12.

The Court set a briefing schedule on the motion, which is now ripe, and held a hearing on June 29, 2022.

## II.    STANDARD

A party seeking a preliminary injunction must show that irreparable harm will occur unless the injunction is issued, there is a substantial likelihood of success on the merits of the underlying claim, the threatened injury outweighs any potential harm that the injunction may cause to the opposing party, and the injunction, if issued, will not adversely affect the public interest. *N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1246 (10th Cir. 2017). A preliminary injunction is "an extraordinary remedy." *Id.* at 1245-46 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Whether to issue an injunction is within the discretion of the court. *See Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001).

## III.   ANALYSIS

### A.    Heightened Standard for Disfavored Injunction

Defendants initially argue that Plaintiff should be held to a heightened standard because it seeks a disfavored injunction that either disturbs the status quo or is mandatory in nature. Doc. 15 at 14-16. Courts disfavor three types of preliminary injunctions: (1) those that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford all the relief that could be awarded after a full trial on the merits. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc). Such injunctions are "more closely scrutinized." *Id.*

On the first point, Defendants argue that "the last uncontested status between the parties entailed Culp McAuley storing the products." Doc. 15 at 15. Defendants argue that the requested injunction would disturb the status quo because Culp McAuley would "continue incurring storage

11

fees" that it might not be able to later recover. *Id.* The Court disagrees this demonstrates a disfavored injunction. As Defendants concede, the status quo is that Culp McAuley is storing the products. Plaintiff seeks an order that Culp McAuley continue storing the products. And at the hearing, Defendants represented that Culp McAuley intended to continue storing at least some of the gloves absent a request for different action by Plaintiff. This does not disturb the status quo— it instead continues everything as it currently is. *See O Centro Espirita Beneficiente Uniao Do Vegetal*, 389 F.3d at 976-77 (explaining that the purpose of an injunction is to preserve the parties' respective positions until a trial on the merits occurs). To the extent Defendants argue they are incurring costs they would not have otherwise incurred, this conflicts with their representation that they intend to continue storing gloves. And as Plaintiff correctly points out, nothing stops Defendants from seeking recovery of those costs to the extent permitted under a contract or by law. Doc. 20 at 3.

As to the second issue, Defendants similarly argue the requested injunction is mandatory because it would require Culp McAuley to continue storing the products while incurring storage fees that it might not be able to recoup, and thus the "the requested injunction is mandatory because it would require Culp McAuley to take on obligations that it otherwise would not have agreed to if it knew it would not be able to sell the products." Doc. 15 at 16. Again, the Court disagrees with Defendants' analysis. The requested injunction does not seek to require any affirmative action by Defendants other than to <u>refrain</u> from disposing of the property or further spending the funds.

Accordingly, the Court finds that Plaintiff does not seek a disfavored injunction, and the ordinary standard applies.[10]

---

[10]   Based on the analysis below, the Court notes it would reach the same decision even if a heightened standard applied.

### B.    Irreparable Harm

Turning to the injunction elements, the Court first considers whether Plaintiff has shown that irreparable harm will occur unless the injunction is issued. Plaintiff makes three arguments regarding irreparable harm. First, Plaintiff argues that it is suffering "substantial harm" in the form of an inability "to operate a business selling health protective products." Doc. 5 at 7. Second, Plaintiff argues that the "transfer, sale, or other disposal or degradation" of the Shield-branded gloves harms Plaintiff because it tarnishes its brand due to Defendants' inability to prove certification or "provid[e] them on a timely basis." *Id.* Third, Plaintiff argues that the "ongoing mismanagement" and commingling of the $3,999,984 paid on the purchase orders "diminish the likelihood of successfully collecting any monetary judgment after resolution on the merits." *Id.* at 8. Defendants argue that Plaintiff's claims are compensable with money damages, Culp McAuley has assets besides the funds in the trust account, and Plaintiff's claim that its brand will be tarnished is speculative. Doc. 15 at 17-22.

To justify an injunction, irreparable harm must be actual versus just theoretical. *Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1148 (D. Kan. 2007). The loss must also be "certain and great," as opposed to "merely serious or substantial." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1262-63 (10th Cir. 2004) (internal quotation and citation omitted); *see also Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 53 (D.D.C. 2011) (explaining that "[i]f a plaintiff has shown that financial losses are certain, imminent, and unrecoverable, then the imposition of a preliminary injunction is appropriate and necessary"). Economic loss is usually insufficient to constitute irreparable harm because those losses can be cured by money damages. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003).

Finally, "wholly conclusory statements alone will not constitute irreparable harm." *Universal Engraving*, 519 F. Supp. 2d at 1148.

### 1.       Harm to Business

Plaintiff first contends it will suffer "substantial harm" because "its ability to operate a business selling health protective products is jeopardized with every passing day" and that the products purchased in the purchase orders "would constitute a primary source of revenue for Plaintiff's health care business." Doc. 5 at 7. This is the extent of Plaintiff's argument on this point in its motion.

Plaintiff's brief argument falls short of its burden to show that the complained-of harm is imminent. *Universal Engraving*, 519 F. Supp. 2d at 1148. Although threats to a business's viability may constitute irreparable harm, simply stating without support that its business selling PPE is "jeopardize[d]" does not meet Plaintiff's burden. *See id.*; *see also See Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986) ("Such threats [to trade or business viability] are typically seen in antitrust actions, where the party seeking the preliminary injunction is faced with a complete or substantial loss of its business during the pendency of the trial unless the injunction issues."). It's also not clear that the claimed harm to Plaintiff is certain and imminent. *See Digital Ally, Inc. v. Corum*, 2017 WL 1545671, at *4 (D. Kan. 2017) ("In contrast, plaintiff here relies just on a theoretical or speculative possibility that it will suffer loss of customers, goodwill, and threats to business viability if the injunction does not issue."). Nor is it clear why harm to Plaintiff's business could not be rectified by money damages or how the requested injunctive relief—enjoining the sale or transfer of the products or further use

of the funds in the trust account—would alleviate this harm and allow Plaintiff to resume operating its PPE business. Accordingly, this argument fails to show irreparable harm.[11]

For the first time in its reply brief, Plaintiff argues that the harm is actually to its "nascent affiliate business, Shield Health Protection Products ('Shield HPP')," which it alleges "may soon be unable to viably operate in the wake of Defendants' mismanagement and misconduct." Doc. 20 at 4. This is essentially the extent of the information in the record on Shield HPP. It's not even clear whether Shield HPP is a separate entity. At the hearing, it was referred to as a subsidiary of Plaintiff. To the extent Shield HPP is a separate entity, it is not a party to this case and has not previously been mentioned in the briefing or in the complaint. Nor is the record clear on how Plaintiff would have standing to defend "Shield HPP's survival as a business." *Id.* Additionally, like the harm initially claimed directly by Plaintiff, the alleged harm that Shield "may soon be unable to viably operate" is speculative and vague.[12]

Accordingly, Plaintiff has not demonstrated irreparable harm through harm to its business.

### 2.   Harm to Brand

Plaintiff's second argument is that the potential sale, transfer, disposal, or degradation of the Shield-branded gloves will harm Plaintiff by tarnishing its brand. Doc. 5 at 7. It argues that Culp McAuley's "inability to prove certification to Digital Ally on the quality of these gloves, let alone providing them [on] a timely basis, reflects poorly on the brand of Digital Ally." *Id.*

---

[11]  At the hearing, Plaintiff presented evidence and argument that its PPE business was not limited to the sale of gloves.

[12]  In its reply, Plaintiff states that "[i]nterest in the gloves and other purchased personal protective equipment, especially those packaged in materials bearing Digital Ally's trademark, suggest Plaintiff is genuinely concerned about making its affiliate business successful, and that the requested preliminary injunction would help mitigate the harm these failed transactions pose to it." Doc. 20 at 5-6. While the Court does not doubt that Plaintiff is strongly interested in seeing its business—and that of any its affiliates—succeed, the Court would be hard pressed to ever deny injunctive relief if this were the standard.

As a preliminary matter, the requested injunction seeks to stop Defendants from "disposing of or otherwise harming" the products acquired as part of the purchase orders. Doc. 4 at 1. To the extent Plaintiff believes its brand will suffer irreparable harm without this injunction, Defendants' counsel represented to the Court at the hearing that Culp McAuley had no plans to do anything with the Shield-branded gloves unless and until Plaintiff directed them to, or the parties could otherwise reach agreement.[13] The Court relies on this representation. Accordingly, it appears Defendants are already doing what Plaintiff wants them to do, i.e. sitting tight on the Shield-branded gloves. The Court nevertheless considers Plaintiff's arguments related to harm to its brand.

Plaintiff's claim that its brand will be harmed turns on three arguments. The first is that Defendants have failed to provide "certification" of the Shield-branded gloves, and that an injunction is needed to prevent the transfer or sale of the gloves to someone who will impute the lack of quality to Plaintiff. But owing to Defendants' representation that they have no plan to do anything with the Shield-branded glove, any alleged lack of "certification" is unlikely to harm Plaintiff's brand. Nor is it even clear that the gloves actually lack certification or quality. Defendants have included a "Spot Inventory Field Inspection Report" from BlueBio, which apparently reflects an audit or inspection of the Shield-branded gloves in Culp McAuley's warehouse. Doc. 18-10. Ross testified at the hearing that he has no evidence that the Shield-branded gloves didn't pass an inspection. To that end, the BlueBio report suggests that the gloves passed inspections, conform to consensus standards, and are otherwise acceptable. *Id.* at 7. Ross

---

[13] As detailed in the Background, the parties dispute the scope of the deal for Shield-branded gloves. Defendants contend that Plaintiff has paid for approximately 1/6 of the Shield-branded gloves that were ordered. Culp McAuley is willing to ship that amount of Shield-branded gloves to Plaintiff on request. Culp McCauley will continue to store and not otherwise dispose of the remaining Shield-branded gloves until resolution can be reached on the scope of the deal. The Court notes that it holds Defendants to this representation.

acknowledged this at the hearing. Plaintiff doesn't necessarily dispute this report other than to note that Defendants have not submitted any correspondence showing it was sent to Plaintiff. Doc. 20 at 6. But this doesn't establish that the Shield-branded gloves lack certification that will hurt Plaintiff's brand.

The second concern Plaintiff has is with the storage condition at Culp McAuley's warehouse. Plaintiff claims that Ross traveled to Culp McAuley's warehouse in April 2022 to see the stored gloves, though it's unclear whether this refers to the Shield-branded gloves or the non-branded gloves purchased with Purchase Order 1, or both. Plaintiff alleges that the gloves that could be observed "were being stored without climate control conditions, potentially reducing the shelf-life and usability of the gloves." Doc. 1 at ¶ 49. Ross testified that during his visit he did not recall the warehouses being air conditioned but does recall that the doors were open with fans running. Defendants argue that Plaintiff raised no concerns about the condition of storage until it filed this case nearly two months later. Doc. 15 at 20. In its reply, Plaintiff only suggests that inadequate storage <u>could</u> lead to cumulative degradation that <u>could</u> eventually damage Plaintiff's brand. But Plaintiff presents no evidence that the gloves are actually being damaged or are actually degrading. And it is yet another layer of speculation that this potential damage to the gloves will irreparably tarnish Plaintiff's brand with customers. And as the Court noted at the hearing, the requested injunction would not alleviate any concerns Plaintiff has with the current storage conditions because the requested injunction seeks to have the gloves to stay where they are.[14]

---

[14] And as noted above, Defendants represented at the hearing that it would comply with a request from Plaintiff to ship at least 1/6 of the Shield-branded gloves to Plaintiff's facility in Kansas. To the extent Plaintiff makes this request, it would alleviate its concern about storage conditions as to at least some of the Shield-branded gloves. Plaintiff also noted the expiration date of the Shield-branded gloves. But it is unclear how the requested injunction addresses that concern.

Plaintiff's third argument is that delays associated with the Shield-branded gloves reflects poorly on Plaintiff or Plaintiff's brand. But Plaintiff has not identified any end-user of or customer for the Shield-branded gloves who might impute delays to Plaintiff. To the extent there is someone waiting on the Shield-branded gloves, it's again unclear how the requested injunction, which would essentially place an indefinite hold on the gloves, would alleviate this potential harm.

Ultimately, Plaintiff's claim that its brand is being tarnished is speculative. Nor is any such harm imminent, as Defendants have represented that they will not take any action on the Shield-branded gloves absent instruction from Plaintiff. Accordingly, Plaintiff has not shown irreparable harm through harm to its brand.

### 3.    Harm to Ability to Collect Money Judgment

Third, Plaintiff contends that the "ongoing mismanagement" of the funds in the trust account "diminish the likelihood of successfully collecting any monetary judgment after resolution on the merits." Doc. 5 at 8. Specifically, Plaintiff argues "upon information and belief" that the funds are being commingled with unrelated funds and are also being used to purchase items not specified in the purchase orders. *Id.*

The Court notes that the evidence at the hearing presented conflicting information about the status of the trust account, including how much money was currently in it.[15] But in both his testimony and his declaration, McAuley indicated that Culp McAuley had offered and would be willing to refund at least some of the funds paid by Plaintiff. Doc. 18-1 at ¶ 18. Although the Court is unable to determine on the current record how much Culp McAuley could or would refund, this offer undercuts Plaintiff's argument that it will suffer irreparable harm due to its inability to collect any future money damages.

---

[15]    Roberts, the attorney in charge of the account, did not testify or provide an affidavit.

Further, as explained above, harm that can be rectified with money is generally not irreparable harm. *See Tri-State Generation & Transmission Ass'n*, 805 F.2d at 355 ("Injury is generally not irreparable if compensatory relief would be adequate."). Significant risk of financial injury under unique circumstances, such as inability to later recover money damages, <u>may</u> constitute irreparable injury. *See Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011) (noting that economic losses that cannot later be recovered because of sovereign immunity can constitute irreparable injury). But an inability to recover economic loss "does not, in and of itself, compel a finding of irreparable harm." *Nat'l Mining Ass'n*, 768 F. Supp. 2d at 53.

Plaintiff's argument on this point also is very brief. Although it contends its ability to collect a money judgment may be diminished, this is just speculation. *See Ireland v. Dodson*, 2007 WL 3232566, at *7 (D. Kan. 2007) ("Moreover, Ireland's testimony about defendants' ability to pay any such monetary damages is purely speculative and lacked any evidentiary basis whatsoever."). Notably, Plaintiff has presented no meaningful evidence that the funds in the trust account are the only assets of Defendants or that Defendants are otherwise unlikely to be able to satisfy a subsequent money judgment.[16] *See Lane v. Buckley*, 643 F. App'x 686, 688 (10th Cir. 2016) (affirming denial of injunction based on lack of irreparable harm where the plaintiff "presented nothing but his own speculative opinions that any of the affected defendants would spend the balance of the loan or that his sister would be unable to pay on a money judgment if he were to prevail in the litigation"). Although the Court understands Plaintiff's arguments that it does not have all of Defendants' financial information, that Culp McAuley had no revenue in 2021, and that Culp McAuley is a relatively new business, Doc. 20 at 8, the Court is disinclined to issue

---

[16] The Court does not suggest that evidence of a defendant's dire financial straits would necessarily justify injunctive relief where the damages are monetary in nature. But to the extent it could, Plaintiff has not even made such a threshold showing.

the requested "extraordinary" relief, *New Mexico Dep't of Game & Fish*, 854 F.3d at 1246, based on Plaintiff's largely unfounded fear that it might not be able to collect on a money judgment should it ultimately prevail.

Further, Plaintiff's allegation that funds are being commingled in the trust account is based only on "information and belief." Doc. 5 at 8. Even with the relaxed evidentiary burden at this stage, allegations based on "information and belief" are generally insufficient to warrant injunctive relief. *Biomin Am., Inc. v. Lesaffre Yeast Corp.*, 2020 WL 1503475, *4 (D. Kan. 2020). To the extent Plaintiff fears that the funds are being used to purchase items not ordered, there are no facts to suggest this is an <u>ongoing</u> issue, even to the extent the masks and Cranberry Evolve gloves were purchased in the past without Plaintiff's consent.

Nor do the cases cited by Plaintiff support the requested relief. In *Resolution Trust Corp. v. Cruce*, 783 F. Supp. 1309, 1311-12 (D. Kan. 1992), the plaintiff was seeking $148 million in damages, which included previously unpaid court-ordered restitution and damages attributable to crimes of dishonesty or deceit, and a separate statute specifically permitted the pretrial remedy of freezing assets. There are no similar facts here. Further, *Tri-State Generation & Transmission* involved an injunction aimed at stopping a sale of all a corporation's assets where the proceeds would have been distributed to the corporation's members, making it nearly impossible to subsequently collect from the corporation, and state law may have prevented the plaintiff from collecting from the corporation's indemnitor. 805 F.2d at 355. Allowing the sale could have also led to the bankruptcy and collapse of the plaintiff before resolution on the merits. *Id.* at 356. This is not the situation here.

In sum, the Court finds Plaintiff has not established that it will suffer irreparable harm absent an injunction. This is reason enough to deny the motion. However, the Court will consider the other elements.

### C.      Likelihood of Success on the Merits

Next, the Court considers Plaintiff's likelihood of success on the merits. Plaintiff brings eight claims. Three are for breach of contract. Three are for breach of the implied covenant of good faith and fair dealing. And the remaining two are for replevin and conversion. It appears that all claims are asserted against all Defendants.[17] The Court finds Plaintiff has not shown a substantial likelihood of success on the merits for three reasons.

First, the agreements at issue are between Plaintiff and Culp McCauley. None of the individual defendants are listed as parties. *See* Doc. 1-1 at 2. It's unclear how Plaintiff is likely to succeed on contract or contract-based claims against individuals with whom it does not have a contract. Plaintiff suggested at the hearing that it believes there is evidence that corporate formalities have not be adequately observed, which would allow it to essentially pierce Culp McAuley's corporate veil. But Plaintiff has not made that argument in its motion (or the complaint) and has only generally pointed to some facts about Culp McAuley, including that it doesn't have a website. To the extent Plaintiff is even making this argument at this time, the current record does not establish that it has a substantial likelihood of winning any of its claims against the individual defendants.[18] Accordingly, the Court finds Plaintiff is not likely to succeed on the merits of its claims against the four individual defendants.

---

[17]   At the very least, the complaint does not differentiate between Defendants.

[18]   Plaintiff believes it may be able to assert a conversion claim against the individual defendants. But the complaint does not allege individualized conduct, nor has Plaintiff made that argument in its motion.

Second, although Plaintiff has pleaded breach of the implied covenant of good faith and fair dealing as three stand-alone claims, this is not a recognized claim under Kansas law. An implied covenant of good faith and fair dealing applies to most contracts in Kansas. *See Waste Connections of Kan., Inc. v. Ritchie Corp.*, 298 P.3d 250, 266 (Kan. 2013). It "is derivative in nature in that it does not create or supply new contract terms, but it grows out of existing ones" and "guides the construction of explicit terms in an agreement." *Kindergartners Count, Inc. v. DeMoulin*, 249 F. Supp. 2d 1233, 1243 (D. Kan. 2003). "Breach of the implied covenant of good faith and fair dealing is not a separate claim, but rather a 'legal argument related to a breach-of-contract claim.'" *H&C Animal Health, LLC v. Ceva Animal Health, LLC*, 499 F. Supp. 3d 920, 940 (D. Kan. 2020) (quoting *Classico, LLC v. United Fire & Cas. Co.*, 2016 WL 7324451, *5 (Kan. Ct. App. 2016)). Accordingly, Plaintiff is unlikely to succeed on its three ostensible claims for breach of the covenant of good faith and fair dealing because those are not standalone claims.[19]

Third, the Court cannot conclude at this time that Plaintiff is substantially likely to succeed on the merits of its breach of contract claims, or its claims for replevin or conversion. Under Kansas law, a breach-of-contract claim requires: "(1) the existence of a contract between the parties; (2) consideration; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) defendant's breach of the contract; and (5) that plaintiff was damaged by the breach." *Ice Corp. v. Hamilton Sundstrand Inc.*, 444 F. Supp. 2d 1165, 1169 (D. Kan. 2006). As noted above, most contracts in Kansas carry an implied duty of good faith and fair dealing. *Waste Connections of Kan.*, 298 P.3d at 266.

---

[19] Breach of the covenant of good faith and fair dealing is more appropriately considered as a legal theory supporting a corresponding breach-of-contract claim. *See H&C Animal Health, LLC*, 499 F. Supp. 3d at 940 (noting that to prevail on such a theory, a plaintiff must plead breach of contract and not breach of implied duty, and then "point to a term in the contract which the defendant[] allegedly violated by failing to abide by the good faith spirit of that term" (internal quotation and citation omitted)). Because Plaintiff has also pleaded associated breach-of-contract claims, the Court will consider its arguments about good faith and fair dealing in that context.

Central to the breach-of-contract claims are two basic questions: what the agreement between the parties was, and how has each side performed. However, both sides have presented <u>wildly divergent</u> answers to both questions. Plaintiff relies primarily on the explicit terms of the purchase orders to support its position. But Culp McAuley contends that the agreements were evolving deals that were revised during face-to-face meetings and in other communications. The Court notes that the purchase orders do state that "[a]dditional or different terms or conditions proposed by [Culp McAuley] . . . will be void and of no effect unless expressly accepted in writing by [Plaintiff]." *See, e.g.*, Doc. 1-2 at 3. But still yet other communications and actions of the parties suggest that the parties were acting on plans beyond the original purchase orders.[20] There was also conflicting evidence about whether Plaintiff expected or requested any of the products to be shipped or sold by Culp McAuley.

The claims for replevin[21] and conversion[22] share similar uncertainties, as both claims are dependent on what the parties agreed to. Central to both claims is that Defendants have denied Plaintiff property to which it is entitled. But where Plaintiff argues it has requested shipment of the 11,000 packages of Cardinal Health Flexal Touch gloves purchased in Purchase Order 1 to its headquarters in Kansas, Doc. 5 at 16, Defendants deny that Plaintiff has ever demanded shipment to Kansas and has instead requested that the gloves be stored until the gloves could be sold to the

---

[20]   It is a little unclear whether Defendants are claiming Plaintiff and Culp McAuley entered new contracts or whether Defendants are arguing the doctrine of promissory estoppel.

[21]   "The elements required to sustain a replevin action are: (1) the plaintiff owned the property alleged in the petition; (2) the plaintiff is entitled to possession of the property; and (3) the defendant unlawfully detained the property." *Merryfield v. Sullivan*, 2015 WL 4716259, at *2 (Kan. Ct. App. 2015); *see also* K.S.A. § 60-1005(a); *Herl v. State Bank of Parson*, 403 P.2d 110, 114 (Kan. 1965).

[22]   "To prevail on a conversion claim, plaintiffs must prove that: (1) they possessed a right in the goods or personal chattels; and (2) defendant exercised control over the goods or chattel to the exclusion of their right." *Alexander v. BF Labs Inc.*, 2016 WL 5243412, at *5 (D. Kan. 2016); *see also Bomhoff v. Nelnet Loan Servs., Inc.*, 109 P.3d 1241, 1246 (Kan. 2005) ("Conversion is the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights.").

government, Doc. 15 at 30-31.[23] As for the 89,400 respirator masks and 16,290 boxes Cranberry Evolve gloves, Defendants argue that Culp McAuley has not asserted ownership rights to the exclusion of Plaintiff's rights because Plaintiff authorized the purchases and has declined shipment of the products. Doc. 15 at 31.

The current record before the Court reflects little more than the parties' diverging views of what has happened over the past year. The Court is disinclined to resolve this fundamental dispute between the parties on such a preliminary and incomplete record. Based on the information presented, Plaintiff may ultimately be able to prevail on some of its claims. But the Court finds it has not made the "clear showing" that it is <u>substantially</u> likely to prevail. *N.M. Dep't of Game & Fish*, 854 F.3d at 1245-46; *see also Ireland*, 2007 WL 3232566, at *8 ("Clearly, there are two conflicting versions of the events leading up to the sale of the aircraft and subsequent attempt to withdraw from the Sale Agreement by Ireland. . . . As such, the Court finds that there is insufficient evidence at this time to say that plaintiffs are substantially likely to succeed on the merits of their claims.").[24]

Because Plaintiff has not shown either irreparable harm or a substantial likelihood of success on the merits, a preliminary injunction is not warranted. However, the Court will briefly address the remaining two factors for completeness.

### D.      Balancing of Potential Harms

Plaintiff argues that the balance of hardships weighs in its favor because the only burden on Defendants is not disposing of the inventory they have been unable or unwilling to sell, and not

---

[23]    Ross's affidavit states that Plaintiff "did not initially intend for Culp McAuley to ship the gloves to [Plaintiff] but rather to sell them itself and share revenue according to the division outlined in the Venture Agreement." Doc. 5-2 at ¶ 6. Ross also testified that Plaintiff has never requested the gloves be sent to Plaintiff's facility in Kansas.

[24]    Even if Plaintiff had made such a showing, the Court would still decline to issue an injunction based on the lack of irreparable harm.

further misappropriating funds. Doc. 5 at 8. Defendants counter that, while Plaintiff will not suffer any harm if an injunction issues, Culp McAuley will be forced to incur storage fees and miss out on selling the products while this case proceeds to a trial on the merits. Defendants also contend that an injunction will damage its reputation in the PPE industry because it "leveraged its reputation to convince Encompass to manufacture the gloves on a line of credit," with the intent of paying the manufacturer as the gloves sold. Doc. 15 at 32.

As explained above, Plaintiff has not demonstrated that it will be irreparably harmed in the absence of an injunction. Further, to the extent Culp McAuley did sell the products (and the Court again notes the representation to the Court during the June 29, 2022 hearing about the Shield-branded gloves), Plaintiff would be entitled to some of the revenue. By contrast, Defendants have argued that preventing Culp McAuley from selling the products—as it is authorized to do under the venture agreement—will cause Culp McAuley to incur storage fees and possibly jeopardize its other contracts. However, it remains a point of dispute whether Culp McAuley entered into the agreement with Encompass on its own initiative or with the agreement of Plaintiff. The Court finds that the balance of the potential harms weighs neutral or leans slightly against the issuance of an injunction.

### E.    Public Interest

Plaintiff argues that the public interest is served by the enforcement of the underlying agreement between Plaintiff and Defendants. Doc. 5 at 9. Defendants argue that the public interest is in enforcing the contracts as modified, and that the public could be harmed "by unravelling a PPE deal geared toward protecting public health" while exacerbating an already-existing shortage of PPE during widespread supply-chain issues. Doc. 15 at 33.

There "is a public interest in upholding enforceable contracts." *Universal Engraving*, 519 F. Supp. 2d at 1149-50. But as detailed in this order, the parties dispute exactly what the contracts at issue require. Both sides seem to believe that the other is not fulfilling their end of the bargain. Thus, to the extent the public has an interest in enforcing contracts, this factor weighs neutral.[25]

## IV.    CONCLUSION

In sum, the Court finds Plaintiff has not made a showing that it will suffer irreparable harm in the absence of an injunction, or that it is substantially likely to prevail on the merits of the case. The balance of the harms and the public interest weigh neutral or against issuing an injunction.

THE COURT THEREFORE ORDERS that Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 4) is DENIED.

IT IS SO ORDERED.

Dated: July 1, 2022                    /s/ *Holly L. Teeter*
                                                HOLLY L. TEETER
                                                UNITED STATES DISTRICT JUDGE

---

[25] Defendants additionally argued that the public interest would be disserved by limiting the sale of PPE given the pandemic and ongoing supply-chain issues. The Court shares this concern and notes that Plaintiff has not really countered it. But the testimony at the hearing provided conflicting and unclear accounts about what PPE Culp McAuley has in its possession for sale, which of those items it intended to sell, and when. Accordingly, the Court is unable to say definitively whether the public interest would be served or disserved by an injunction based on access to PPE.