## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**DIGITAL ALLY, INC,**

      **Plaintiff,**

      **v.**
                            **Case No. 2:22-cv-02203-HLT**

**CULP MCAULEY, INC, et al.,**

      **Defendants.**

---

### MEMORANDUM AND ORDER

This case stems from a $4 million contract dispute between Plaintiff Digital Ally, Inc. and Defendant Culp McAuley, Inc. ("CMI"). Plaintiff also sued individuals associated with CMI: Mark Depew, Campbell McAuley, and Brandon Culp. Depew is represented by counsel and continues to actively participate in the case. McAuley, Culp, and CMI are unrepresented by counsel, and all three have ceased participation.

Depew moves for summary judgment. Doc. 143. Plaintiff cross-moves for summary judgment against Depew and McAuley. Doc. 145. Plaintiff also moves for default judgment against Culp and CMI. The Court addresses the claims against Depew in this Memorandum and Order. Depew seeks a ruling that he is not an alter ego of CMI, entitling him to summary judgment on all claims but one. Depew also contends he is entitled to summary judgment on the remaining claim under the Kansas Uniform Fraudulent Transfer Act ("KUFTA"), K.S.A. § 33-204 and § 33-205.

No reasonable jury could find that Depew is the alter ego of CMI because he is not an owner of CMI and no reasonable jury could find the factors for piercing the corporate veil support treating him as CMI's alter ego. And no reasonable jury could find Depew liable under KUFTA

because he was not a transferor, transferee, or beneficiary of fraudulent transactions. The Court grants Depew summary judgment and denies Plaintiff's motion as to Depew.

## I.    BACKGROUND[1]

### A.    The Parties

Plaintiff is a Nevada corporation with its principal place of business in Lenexa, Kansas. CMI was incorporated in December 2020. CMI is a now-inactive Wyoming corporation with its principal place of business in Cheyenne, Wyoming. Depew lives in Wyoming, Culp in Arizona, and McAuley in California.

Culp and McAuley co-founded CMI with each owning 50%. They are the only two owners. An August 5, 2021 filing with the Wyoming Secretary of State identified the names of CMI's "directors, officers, limited liability company managers, managing partners, trustees or persons serving in a similar capacity" as McAuley and Culp. Larry Roberts was CMI's corporate attorney. Roberts was a defendant in this case, but the Court dismissed him for lack of personal jurisdiction. Doc. 111. Roberts signed the Articles of Incorporation.

CMI may or may not have bylaws. It also may not have held annual shareholder meetings, although McAuley testified that Roberts told him certain conversations constituted shareholder meetings and that McAuley thought Roberts kept minutes. CMI currently has no revenue.

### B.    Depew's Involvement in CMI

Depew has never been an owner of CMI. But he held various roles for the company. He was authorized to speak and conduct business on CMI's behalf.[2] CMI's Articles of Incorporation

---

[1]    For purposes of summary judgment, the following facts are uncontroverted or recited in the light most favorable to the nonmoving party. The Court has pulled the facts from both motions and their briefing, as well as the pretrial order.

[2]    Both Culp and McAuley testified that CMI granted Depew a "letter of authorization." Plaintiff objects to this statement as lacking evidentiary support because Defendants never produced the "letter of authorization." But regardless of the letter's existence, it appears uncontroverted that Depew acted as an agent of CMI.

listed him as CMI's registered agent in Wyoming. CMI previously identified Depew's home address and later his office address as its principal place of business. And Culp testified that to his knowledge, Depew's role in CMI was to serve as its registered agent and to "assist where needed," but that he did not have a direct role in CMI.

CMI discovered in February 2022 that its annual report was delinquent. CMI asked Depew to go to the Wyoming Secretary of State's Office to file the annual report on February 8, 2022. But Depew was not an officer and was no longer CMI's registered agent. Roberts told Depew that he would "designate" Depew as CMI's Secretary for the day and only for the purpose of filing the Annual Report. Roberts told Depew he could resign from the position the following day. Depew thus signed a "Certificate of Reinstatement" as CMI's Secretary and a "Profit Corporation Annual Report" as CMI's Treasurer or Fiscal Agent on February 8, 2022. Depew then sent Roberts a letter resigning as CMI's Secretary on February 9.

Depew was the primary point of contact between CMI and Plaintiff. When Depew messaged Plaintiff, he regularly used inclusive first-person plural pronouns like "us," "we," and "our." Depew has known Plaintiff's CEO Stanton Ross socially and professionally for decades. Depew introduced Ross to McAuley and Roberts in 2021 to discuss a proposed business venture between Plaintiff and CMI involving nitrile gloves. Depew and Roberts met with Ross and other representatives of Plaintiff in August 2021 via videoconference. CMI's representatives (including Depew) presented a PowerPoint presentation to Plaintiff. The presentation included a slide stating that CMI had a federal contract for $750 million per month. Depew assisted with preparing the presentation. Depew, McAuley, and Roberts (on behalf of CMI) held another videoconference with Ross and Plaintiff's Board of Directors on August 31, 2021. CMI showed the same PowerPoint presentation and displayed a "read-only" version of the alleged contract with the

federal government that purportedly authorized CMI to sell up to $750 million per month in personal protective equipment ("PPE") to the federal government. The purported contract was allegedly authorized and signed by Gregory Rollins, an official in the General Services Administration ("GSA"). Rollins denies having ever signed any contractual document involving CMI, and Rollins has further stated that there were no records relating to any purported contract between the federal government and CMI. There has never been any contract between CMI and the federal government.

Depew did not make any statements to Ross or anyone else affiliated with Plaintiff that Depew knew to be false. But Depew had a leading role in negotiations with Plaintiff. Plaintiff argues that Depew's role belies the suggestion that he unknowingly made false statements. Ross stated that he always understood that Depew was a "part of" CMI and that Depew, Culp, and McAuley were partners and "as one." Depew ultimately brought two customers to CMI: Plaintiff and a customer named Matt Jones. Jones ordered approximately $900,000 in Yani gloves in the fall of 2021.

### C.    Purchase Orders

Plaintiff and CMI agreed on September 22, 2021 that CMI would purchase certain nitrile gloves and either deliver those gloves to Plaintiff or sell gloves on Plaintiff's behalf. Plaintiff submitted a purchase order to CMI on that same day for 104,166 boxes of Cardinal Health Flexal Touch nitrile gloves ("PO #1"). Plaintiff wired $2,499,984 for PO #1 to a trust account ending in -0577 and owned by the Law Offices of Larry M. Roberts, Esq. at Bank of America. The terms of PO #1 provided that the payment was a "prepayment" and was irrevocable. The terms also stated that Plaintiff "will provide disbursement instructions for this legal trust account." CMI spent $247,500 on Cardinal Flexal Touch nitrile gloves in connection with PO #1.

Plaintiff and CMI agreed to a second order of nitrile gloves in November 2021 ("PO #2"). These gloves were to be packaged in a container bearing the "Shield" brand. Depew wrote to Plaintiff on November 5, 2021, forwarding a message from Roberts with bank account information so that Plaintiff could provide payment for PO #2 to an account at JPMorgan Chase bank ending in -8530 and named "Law Offices of Larry M. Roberts, A Professional Corporation IOLTA Trust Account." Plaintiff wired $1,500,000 to the -8530 Account on November 10 as prepayment of the full cost of the designated gloves ($1,416,000) plus an additional $84,000 to be applied to shipping invoices or to future compensation for future sales by CMI.

Plaintiff submitted an authorized copy of PO #2 to Depew and McAuley on November 17. The Shield-branded gloves were to be delivered to Plaintiff by March 1, 2022. None of the funds that Plaintiff provided for PO #1 or PO #2 have been returned.

### D.    Depew's Involvement with Other Entities

#### 1.    Aftermaster, Inc.

Aftermaster, Inc. is an audio-technology company. It operated a recording studio in Hollywood, California at one point. Depew is the President and CEO of Aftermaster, which is now a "dormant shell." But, at one time, it was a publicly traded company with 500+ shareholders. Depew was a shareholder during the relevant times but owned less than 50% of Aftermaster's stock. He was one of three directors. Depew approved (upon McCauley's request) CMI sending $5,000 to Aftermaster on September 22, 2021, in lieu of paying Depew a commission.

CMI agreed to purchase from Aftermaster the rights to operate the Hollywood recording studio. CMI took possession of the Hollywood recording studio pursuant to the agreement. CMI renamed the studio Symboliq.

Aftermaster filed for Chapter 11 bankruptcy on August 20, 2020. Nineteen payments totaling $453,800 were made to Aftermaster from the -0577 account between September 23, 2021 and May 2, 2022. Aftermaster issued convertible promissory notes to CMI for the amount of the payments from CMI to Aftermaster. But the value of these notes does not match the payments, they have never been repaid, and they are now worthless. An additional two payments totaling $105,000 ($50,000 and $55,000) were made from the -0577 account on April 11 and 21 to Gellert Scali Buskenell & Brown, LLC. This entity was Aftermaster's bankruptcy counsel. The description for the April 21 payment said "per indemnity agreement." Plaintiff claims that both of these payments were made "purportedly on behalf of Cowboy MD." But the evidence cited does not support this conclusion.

### 2.      Cowboy MD LLC ("Cowboy MD")

Depew is the sole member of Cowboy MD. Three payments totaling $63,940 were made to Cowboy MD from the -0577 account between October 15 and November 4, 2021. CMI made the payments to Cowboy MD to pay Depew a commission on Plaintiff's glove purchases. Cowboy MD deposited $295,000 in the -0577 account on May 19, 2022.

Depew filed a declaration on June 1, 2021, in support of Aftermaster's Third Amended Plan of Reorganization. Depew stated in the declaration that Cowboy MD had provided debtor-in-possession financing to Aftermaster and had periodically financed Aftermaster before Aftermaster filed for bankruptcy. Depew also stated that Cowboy MD was committed to providing Aftermaster with up to $1 million in post-confirmation financing. The bankruptcy court approved Aftermaster's plan. Aftermaster later reported in a status report on November 20 that "proposed payments thereunder would, in part, depend on post-confirmation financing from Cowboy MD [] to fund its operations. Cowboy MD [] has committed to providing the Debtors [sic] with up to

$1 million in post-confirmation financing on as needed basis." Aftermaster further reported that "after confirmation, Cowboy MD informed [Aftermaster] that it would be delayed in providing the post-petition financing." And Aftermaster later reported that Cowboy MD provided its "first tranche of post-petition financing for an aggregate amount of $50,000.00" on April 11, 2022, "which was sufficient to pay the administrative claims of Hover 17, LLC and Bielli & Klauder LLC in full and $20,000 to be applied towards the administrative claim of Gellert Scali[]." Cowboy MD provided $55,000 as a "second tranche" of post-petition financing to Aftermaster on April 26, 2022.[3] Aftermaster used those funds to pay overdue taxes and a portion of Gellert Scali's administrative claim.

### 3.    CGC Financial Corporation ("CGC")

CGC is an entity that planned to sell gloves branded as "Blue Ribbon Gloves." Depew, McAuley, and Culp were three of the five or six CGC "shareholders." But none of the principals ever received any shares. Depew was also a Vice President of CGC. The entity has been shut down since early 2022.

A payment from account -0577 in the amount of $25,000 was made to CGC for a "charity scholarship" in November 2021. The money was used for a donation to a University of Wyoming fundraising event so Blue Ribbon Gloves could co-sponsor the event. CMI also transferred another $10,000 to CGC in November 2021.

### E.    The Trust Accounts and Transactions

Depew testified that he did not have access to Roberts's trust accounts. McAuley testified that he (McAuley) and Culp were the only individuals authorized to approve transfers from the

---

[3]   The Court recognizes that the first and second tranche of post-petition financing amounts equal those amounts transferred from the -0577 account on April 11 and 21. The Court presumes this is why Plaintiff claims both payments from the -0577 account were "purportedly on behalf of Cowboy MD." But again, the evidence Plaintiff cites in support does not support this conclusion.

trust accounts on behalf of CMI. Both Depew and McAuley testified that Depew lacked authority to direct transfers from the trust accounts.

Plaintiff claims that CMI made the following transfers from the trust accounts to Depew or entities associated with Depew:

- $4,500 transfer to Depew on May 10, 2022;

- Three transfers totaling $63,940 to Cowboy MD;

- Two transfers totaling $35,000 to CGC Financial;

- $2,600 transfer to Digital Marketing Group for "expenses per M. Depew"; and

- Payments totaling at least $571,300 to or on behalf of Aftermaster, including $105,000 to Aftermaster's bankruptcy counsel and $12,500 for Aftermaster's debt.

## II.    STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Courts applying this standard view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation and citation omitted). A court faced with cross-motions for summary judgment "must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 906–07 (10th Cir. 2016). Courts treat them separately;

denying one does not require granting the other. *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007).

## III.   ANALYSIS

Plaintiff asks the Court to disregard the corporate entity of CMI and hold Depew liable for its actions based on the alter-ego theory. Plaintiff argues that the alter-ego theory applies to all remaining counts in the complaint (1, 3, 5, 6, 7, and 8). The Court first addresses this argument. The Court determines that no reasonable jury could find the theory applies. This leaves one claim brought against Depew for his individual acts (Count 8). The Court discusses that claim separately.

### A.   Alter Ego

The premise of piercing the corporate veil is that individuals may not insulate themselves from liability by using the corporation as an instrumentality to conduct their own business. *Sampson v. Hunt*, 665 P.2d 743, 751 (Kan. 1983). Courts consider the following factors when evaluating whether to disregard a corporate entity:

> (1) Undercapitalization of a one-man corporation, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) siphoning of corporate funds by the dominant shareholder, (5) nonfunctioning of other officers or directors, (6) absence of corporate records, (7) the use of the corporation as a facade for operations of the dominant stockholder or stockholders, and (8) the use of the corporate entity in promoting injustice or fraud.

*Amoco Chems. Corp. v. Bach*, 567 P.2d 1337, 1341-42 (Kan. 1977). No single factor is required, but under the right circumstances, any one factor could be enough. *See Wichita Destination Devs., Inc. v. Focus Hosp. Servs., LLC*, 365 F. Supp. 3d 1172, 1178 (D. Kan. 2019). If courts find that the corporate veil should be pierced and the corporation is found ultimately liable, then the individuals are likewise liable. But there is a presumption of separateness. *Cyprus Amax Mins. Co. v. TCI Pac. Commc'ns, LLC*, 28 F.4th 996, 1007 (10th Cir. 2022). And courts should reluctantly

and cautiously exercise the power to pierce the corporate veil. *Amoco Chems. Corp*, 567 P.2d at 1341.

The parties do not analyze the alter ego theory as to each individual claim and instead argue the issues globally.[4] The Court thus resolves the issues as briefed.

Plaintiff contends that (1) CMI is a sham entity and (2) Depew took numerous actions that demonstrate his key role with CMI and how he used CMI as an instrumentality. Plaintiff also contends that Depew wants the Court to create a formalistic rule that because he was not a shareholder of CMI, he cannot be CMI's alter ego. This is not what Depew seeks. He asks the Court to consider his lack of ownership. But he does not contend that ownership is the only or dispositive factor. The Court first looks at Plaintiff's evidence for why the alter-ego doctrine applies and then explains why it does not.

Plaintiff argues that the following evidence shows CMI was a sham entity: (1) it received minimal capitalization from Culp and McAuley, had no bank account, and had virtually no assets other than the funds supplied by Plaintiff and Matt Jones; (2) it failed to observe corporate formalities; (3) it did not pay dividends; (4) it allowed fund-siphoning; (5) it had no board and appears to have been haphazard with designation of officer roles; (6) it lacks corporate records; (7) it was a "façade for the personal purposes of Depew and others"; and (8) it was "used as an instrumentality by its affiliated individuals (including Depew) to promote injustice and fraud against Digital Ally . . . ." Doc. 156 at 29-30.

Plaintiff next argues that the following evidence of Depew's "key role" supports treating him as CMI's alter ego: (1) Depew initiated the relationship with Plaintiff and induced Plaintiff to

---

[4]   The parties agreed in the pretrial order that Kansas law governs. Doc. 139 at 2. They also concede that even if Wyoming law governs the analysis for veil piercing, the law of the Kansas and Wyoming are substantially similar. *Id.*

enter into the purchase orders; (2) Depew was involved in preparing and presenting the PowerPoint presentation that falsely represented the non-existent federal government contract; (3) Depew held himself out as a principal and insider of CMI; (4) Depew was the point person and sole communicator with Plaintiff; (5) Depew repeatedly referred to CMI in first-person-plural language ("we," "our," and "us"); (6) Depew continued working with Plaintiff on behalf of CMI after Plaintiff submitted the purchase orders, causing Plaintiff to reasonably understand Depew to be a partner in CMI; (7) Plaintiff sent the Term Sheet and PO #1 to Depew alone and sent the executed copy of PO #2 to him; (8) Depew's residence and later his office were listed as CMI's principal place of business; and (9) Depew signed public filings as CMI's "Secretary" and its "Treasurer or Fiscal Agent."

The Court first examines whether a reasonable jury could find that CMI was a sham entity. The evidence suggests that it may have been; there is an absence of capitalization, bank accounts, assets, dividends, a governing board, and corporate records. But even if CMI was a sham entity, such a finding does not mean that anyone associated with CMI was its alter ego. The allegations of wrongdoing must still be tied to Depew's connection with CMI. This connection is what is missing. The lack of corporate formalities alone does not mean that Depew was using CMI for his own personal purposes or as an instrumentality to promote injustice and fraud. CMI was not a one-man corporation owned by Depew. He was not a shareholder, so non-payment of dividends, siphoning by the dominant shareholder, and use of CMI as a facade for operations of the dominant shareholder do not reflect Depew's dealings. He was an officer for only one day, which makes the "nonfunctioning" of other officers irrelevant to inquiries about Depew. In short, nearly all of the factors for piercing the corporate veil are irrelevant as applied specifically to Depew.

Next, the Court looks at Depew's role within CMI. Plaintiff fails to show that Depew's "key role" means that every reasonable juror would find that he was the alter ego of CMI (as required for Plaintiff's motion). Depew, on the other hand, demonstrates that no reasonable juror could find he was. Depew is not an owner of CMI. *United States v. Vernon* indicates that a non-owner can be held liable as an alter ego. 814 F.3d 1091, 1101 (10th Cir. 2016). But *Vernon* involved a nominal owner who allowed the non-owner to dominate and control the entity. For *Vernon* to apply, Plaintiff must have evidence suggesting a level of control and domination. As *Vernon* observed, "[p]ractically, the chances are slim that owners will permit a non-owner to so dominate the entity as to turn the entity into [the] non-owner's alter ego or instrumentality—unless the formality of ownership is itself a deception and part of the misuse of the entity structure." *Id.* at 1102. The problem with much of Plaintiff's evidence is that it is targeted at the <u>owners</u> of CMI. The uncontroverted evidence indicates that Depew was an <u>agent</u> of CMI, but not one with control and domination over the company or the owners.

Plaintiff overstates the evidence of Depew's involvement with CMI. Depew had a longstanding friendship with Plaintiff's CEO. It is therefore natural that Depew would be the main point of contact for communications between the companies. He briefly acted as CMI's registered agent in Wyoming. But being a registered agent is not a "key role." *Cf. Liberty Highrise Pvt. Ltd. v. Praxis Energy Agents DMCC*, 632 F. Supp. 3d 562, 571 (S.D.N.Y. 2022) (finding alter ego allegations insufficient where the "[p]laintiff variously alleges merely that Kyriazis 'communicated with Liberty Highrise on behalf of all three Praxis companies,' 'is the manager of Praxis Dubai,' is a 'director and sole shareholder of Praxis Singapore,' is the 'director and registered Agent for Praxis USA,' and held himself out as 'the Legal Advisor . . . for Praxis Singapore and Praxis USA'"); *Carlson v. Clapper*, 2019 WL 1061743, at *9 (N.D. Cal. 2019) ("The

allegations that Mr. Clapper is an officer of ScanX and ScanX's registered agent for service of in California, and that he and ScanX share the same address as listed on the California Secretary of State's website are insufficient to support claims against Mr. Clapper under an alter ego theory of liability.").

Depew may have helped prepare and present the PowerPoint presentation including information about a non-existent government contract. But the uncontroverted evidence shows that he did not <u>know</u> about the fraud until after Plaintiff filed suit.[5] And Plaintiff's own perception that Depew was a principal and insider of CMI does not make it so. "Public perception" is not a factor for alter-ego liability in Kansas.[6] *See Amoco Chems. Corp.*, 567 P.2d at 1341-42 (listing factors). *But see McNicholas v. Century Link, Inc.*, 2022 WL 4002314, at *5 (E.D. Pa. 2022) (considering public's perception). Neither does Depew's written use of first-person plural pronouns, Depew's

---

[5]  Plaintiff suggests that the evidence merits an inference that Depew recklessly represented that the government contract existed. *See* Doc. 146 at 36 ("Depew and McAuley, purportedly acting on behalf of [CMI], knowingly or recklessly made false representations to Digital Ally about [CMI's] ability to sell nitrile gloves, including false statements about the existence of a purported contract authorizing [CMI] to sell up to $750 million per month in PPE to the federal government."); 37 ("McAuley and Depew knew or were reckless in disregarding that the government contract did not exist, yet they led Digital Ally to believe there was to induce it to enter the purchase orders (which it did)."). But Plaintiff's evidence is insufficient even to show reckless conduct by Depew. The Court is uncertain what evidence Plaintiff claims shows recklessness. But it seems that Plaintiff is just arguing that Depew was involved in CMI's business, so he must have known or been tipped off that there was no government contract. Plaintiff has not pointed to <u>any</u> evidence in the record that supports this assumption. For example, Plaintiff has not pointed to any emails or text messages suggesting that Depew knew the contract was fake. (Plaintiff does partially block-quote Depew's December 31, 2021 email to McAuley, which expresses general disappointment with Culp. But the email does not suggest that Depew knew the government contract didn't exist and instead refers hopefully to future government contacts.) Plaintiff does not point to anything in the purported federal government contract that would have alerted Depew that it was forged; to the contrary, the acquisition letter was on apparent GSA letterhead. Plaintiff has not adduced evidence that Depew was familiar with government contracts or the process to obtain one. Plaintiff has not adduced evidence that the apparent signatory of the letter (Gregory Rollins) was a fake name that could have flagged fraud with a quick internet search (it was not). And Plaintiff has not adduced evidence that Depew had access to bank account balances, such that he would have known that no payments from the government came in. Depew, on the other hand, affirmatively answered an interrogatory stating that he did not know the contract lacked authenticity until he received an email from Gregory Rollins on September 23, 2022. He stated that he would have become suspicious at some point 1-2 months prior. Plaintiff filed this case on May 31, 2022. There is simply nothing in the record that contradicts Depew's statements.

[6]  This argument sounds more to the Court like one of apparent authority under agency principles.

one-day stint as CMI's Secretary, or the use of his home and office addresses for public filings.

*Cf. Liberty Highrise Pvt. Ltd.*, 632 F. Supp. 3d at 571; *Carlson*, 2019 WL 1061743, at *9.

There is testimony that Depew had actual authority to act on behalf of CMI under a letter of authorization. McAuley testified in deposition that the letter of authorization was:

> sort of like a salesman in a store. I mean, it's – it's he was just sort of out there helping the company because we needed help, and he would assist in, you know, helping logistics. He would help in shipping. He would help in, you know, all matters. He would look for business for the company. But, again, he brought it from the company to the complete approval to do so or not, you know.

Doc. 146-2 at 167. Culp testified similarly and stated that to his knowledge, Depew "was also trying to assist where needed, but didn't have a – a direct role in the company." Doc. 144-2 at 4. Having authority to act on behalf of an entity differs from controlling the entity. Indeed, an agency relationship presupposes that the agent and principal are separate and distinct.

Finally, Plaintiff claims that Depew had actual control and domination because some bank account funds were transferred to Depew or his affiliated companies. But the uncontroverted evidence shows that Depew did not control funding decisions about the bank accounts. McAuley testified that Depew was not authorized to make payment decisions. Plaintiff tries to treat as one Depew and his related entities such as Aftermaster, Cowboy MD, and CGC. But to do this, Plaintiff would need to show that Depew was the alter ego of each of these entities. Plaintiff has not pleaded this or submitted evidence showing that he was.

There is simply no evidence that Culp or McAuley were merely nominal owners or that they allowed Depew to "dominate and control" CMI. They all testified that Depew's involvement with CMI was limited. Depew was not an employee of CMI. He did not have a formal role (other than being appointed officer for one day). The Court is mindful that the alter-ego doctrine is to be used sparingly. *See Amoco Chems. Corp*, 567 P.2d at 1341. This is not an instance in which a

reasonable jury could find it applies. Conversely, every reasonable jury would find that it did not apply.

Depew is entitled to summary judgment on the alter-ego issue. Plaintiff is not. Alter-ego is the only theory that Plaintiff uses to allege Depew's liability on Counts 1, 3, 5, 6, and 7. This leaves only Count 8 under KUFTA for consideration based on Depew's own acts.

### B.    KUFTA Claim

Depew contends that he is not a proper party to the KUFTA fraudulent transfer claim because he is not a transferor, transferee, or beneficiary of fraudulent transfers. KUFTA offers creditors an avenue to avoid transfers that were made with intent to "hinder, delay or defraud a creditor."[7] K.S.A. § 33-204(a)(1). Courts typically look for so-called "badges of fraud" to determine whether transfers were made for improper purpose. *Id.* § 33-204(b); *In re Shore*, 305 B.R. 559, 567 (Bankr. D. Kan. 2004). This non-exclusive list includes the following:

> (1) The transfer or obligation was to an insider;
> (2) the debtor retained possession or control of the property transferred after the transfer;
> (3) the transfer or obligation was disclosed or concealed;
> (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> (5) the transfer was of substantially all the debtor's assets;
> (6) the debtor absconded;
> (7) the debtor removed or concealed assets;
> (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

---

[7]    KUFTA also defines as fraudulent transfers ones that are made "without receiving a reasonably equivalent value in exchange for the transfer or obligation" under certain conditions. K.S.A. § 33-204(a)(2). This definition is examined more closely in Section III.B.3.

K.S.A. § 33-204(b). Fraudulent intent may be shown when one or more badges of fraud are present. *In re Taylor*, 133 F.3d 1336, 1339 (10th Cir. 1998). The text of KUFTA provides that a "judgment may be entered against: [t]he first transferee of the asset or the person for whose benefit the transfer was made . . . ." K.S.A. § 33-208(b)(1). Plaintiff claims that every transfer made from the trust accounts that was <u>not</u> for acquiring the specified gloves was a fraudulent transfer. Doc. 146 at 39.

The remedies available under KUFTA are limited:

> subsection (a) of K.S.A. 33-207 provides remedies only against transfers, obligations, and assets, that is in rem relief (relief against property). This means the language of K.S.A. 33-207(a)(3)(C) … authorizing "any other relief circumstances may require" does not invite courts to craft remedies against persons involved in an avoidable transfer, but only additional remedies against the transfers, obligations, or assets involved. The provision would be stretched beyond recognition if it were applied to authorize in personam relief against every person who might have participated in the transfer. K.S.A. 33-208(b), however, does authorize monetary in personam relief, but only against a limited group of persons, namely, the first transferee of the fraudulent transfer, the person for whose benefit the fraudulent transfer was made, or a subsequent transferee who did not take in good faith for value. … K.S.A. 33-208(b) contains no language even remotely suggesting courts are free to expand this list of persons against whom a judgment may be entered.

*In re Terra Bentley II, LLC*, 2011 WL 671753, at *7-8 (Bankr. D. Kan. 2011). Bearing this limited scope in mind, the Court turns to whether the uncontroverted evidence shows Depew was a transferor, transferee, or beneficiary of any alleged fraudulent transfers.

### 1.     Depew as Transferor

The Court first considers whether the uncontroverted evidence establishes that Depew was a "transferor" of any alleged fraudulent transfers. The Court has already determined that no reasonable jury could find that Depew acted as an alter ego of Plaintiff. Plaintiff must show, then, that Depew's own actions subject him to liability under KUFTA.

Plaintiff claims Depew personally directed and approved payments from the trust accounts. Doc. 156 at 38. And Plaintiff claims Depew had authority over the trust accounts because he publicly identified himself as CMI's "Treasurer or Fiscal Agent" and admits that he held that role. *Id.* at 38-39.

The bank accounts were in Roberts's name. Roberts controlled the accounts, requiring written instructions from Culp or McAuley to release funds. The only evidence Plaintiff has to suggest that Depew was a transferor is (1) use of the term "per M. Depew" on one transfer and (2) Depew approved (at McAuley's request) that a commission payment to be sent to Aftermaster instead of directly to Depew. Neither of these create a question of fact whether Depew controlled the accounts.

Even less persuasive is Plaintiff's argument that Depew must have controlled the accounts because he identified himself at one point as "Treasurer or Fiscal Agent" on a corporate document. At most, this one-time designation suggests that Depew may have been involved financially in CMI's affairs. But having some level of financial involvement is not the same thing as making specific transfers. *See Terra Bentley II*, 2011 WL 671753, at *9. KUFTA does not impose liability for persons involved generally. It specifically provides relief from <u>transferors</u>. *See id.* at *5. There is a complete absence of evidence suggesting that Depew actually made any transfers or had the ability to do so.

### 2.    Depew as Transferee or Beneficiary

The Court next looks at the question of whether Depew can be liable as a transferee or a beneficiary. KUFTA provides that monetary judgment may be entered against the "first transferee" of the asset or against any "subsequent transferee" other than a good-faith transferee. K.S.A. § 33-208(b). "[A] 'transferee' has 'dominion over the money or other asset, the right to put the money

to one's own purposes.' . . . The 'initial' transferee is the first entity to have such dominion or right." *In re Hansen*, 341 B.R. 638, 643 (Bankr. N.D. Ill. 2006) (discussing Bankruptcy Code, which uses similar language). A "beneficiary" may also be subject to judgment. K.S.A. § 33-208(b).

> The transfer beneficiary is a person who, while not the initial transfer, nonetheless receives a benefit as a result of the transfer. The quintessential example is when a third-party guarantor has its liability reduced when the debt it guaranteed is paid through an avoidable transfer from the debtor to the lender. Benefit occurs without the beneficiary ever holding the money or property, precisely because someone else received it. The benefit must be direct, ascertainable and quantifiable and must correspond to, or be commensurate with, the value of the property that was transferred.

*In re Arabella Petroleum Co., LLC*, 647 B.R. 851, 871 (Bankr. W.D. Tex. 2022) (citations and quotation marks omitted).

Plaintiff claims that Depew was a direct recipient of at least one transfer, plus three commission payments made to him through Cowboy MD. Plaintiff argues that each of these transfers was fraudulent because Depew has not shown an entitlement to commissions from Plaintiff's funds. Nor has he shown the so-called commissions were equivalent to any value he provided CMI. The Court will assume for purposes of summary judgment that Depew was a transferee or beneficiary of these four transfers. The Court addresses these transfers further in the next section.

Plaintiff also claims Depew is deemed a transferee or beneficiary of the transfers from CMI to Aftermaster and its bankruptcy counsel, as well as transfers to CGC. Plaintiff contends that Depew exercised dominion and control over Aftermaster, making him a transferee, because: (1) Depew's brother-in-law is the Chairman at Fortress Bank; (2) both Aftermaster and Cowboy MD have accounts at Fortress Bank; (3) CMI made multiple transfers from the -0577 account to

Aftermaster's Fortress Bank account; (4) Depew had signatory authority over the account that received the funds; (5) CMI sent a payment of $36,000 on April 14, 2022 for "payroll," providing a reasonable inference that Depew used the funds to pay himself as Aftermaster's president and CEO; and (6) Depew controlled Aftermaster's finances. Doc. 156 at 40.

Plaintiff fails to bring forth evidence suggesting that these transfers were, in fact, made to Depew as transferee. There is no evidence that Depew exercised dominion over the funds or had the right to use them for his own purposes. Notably, Aftermaster was a publicly traded company. Depew was not a majority shareholder. And Plaintiff doesn't even try to explain how transfers to Aftermaster's counsel were effectively transfers to Depew. Neither has Plaintiff produced any evidence that Depew was a subsequent transferee of any funds transferred to Aftermaster, its counsel, or CGC. Plaintiff's attempt to connect Depew to the transfers because of his familial and personal connections with Fortress Bank is insufficient as a matter of law to qualify Depew as a transferee.

Plaintiff contends Depew was a beneficiary of the transfers for similar reasons. Plaintiff points to all Depew's ties to Aftermaster. These include (1) being CEO, president, and a shareholder of Aftermaster; (2) investing over $2 million in Aftermaster; (3) using Cowboy MD to provide DIP financing during Aftermaster's bankruptcy proceeding; and (4) using Cowboy MD to provide post-petition and post-confirmation financing for Aftermaster. Doc. 156 at 41-42. Plaintiff also contends that Depew was a beneficiary of the $25,000 transfer from the -0577 account to make a donation to the University of Wyoming, which is his alma mater. Doc. 156 at 42-43 n.12.

Plaintiff again fails to present evidence from which a reasonable jury could find that Depew was the beneficiary of transfers made to CGC, Aftermaster, or Aftermaster's bankruptcy counsel.

Plaintiff does not identify a benefit that Depew received through the transfers. *See In re Green Field Energy Servs., Inc.*, 594 B.R. 239, 287-88 (Bankr. D. Del. 2018) (finding that an individual's management and ownership of transferee entities did not mean he was the beneficiary of transfers because there was no evidence that he personally received transfers or had access to them); *In re Arabella Petrol. Co., LLC*, 647 B.R. at 871-72 (same). Simply alleging that Plaintiff received a benefit by way of his association or management of other entities is insufficient. *See In re Green Field Energy Servs., Inc.*, 594 B.R. at 287-89; *see also Cleveland-Cliffs Burns Harbor LLC v. Boomerang Tube, LLC*, 2023 WL 5688392, at *13 (Del. Ch. 2023). Plaintiff's attempt to recover from Depew for transfers to entities he is associated with is a thinly disguised allegation that Depew is their alter ego. Plaintiff has not set forth evidence supporting application of the doctrine against these other entities.

There is no record evidence from which a reasonable jury could find Depew was the transferee or beneficiary of any of the transfers, with the exception of the four noted below.

### 3.    Were the Transfers Fraudulent?

Finally, there is the issue of whether Plaintiff presents evidence that the transfers were fraudulent, actually or constructively. Depew contends that even if the Court accepts that Depew was a transferee or beneficiary of the May 10, 2022 transfer directly to him and the three transfers to Cowboy MD (on October 15, November 1, and November 4, 2021), Plaintiff has failed to proffer evidence that they were fraudulent. A transfer is actually fraudulent if made "with actual intent to hinder, delay or defraud any creditor of the debtor." *Id.* § 33-204(a)(1). And a transfer is constructively fraudulent if made "without receiving reasonably equivalent value in exchange for the transfer or obligation" and the debtor:

> (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> (B) intended to incur, or believed or reasonably should have believed that such debtor would incur, debts beyond such debtor's ability to pay as they became due.

K.S.A. § 33-204(a)(2); *see also* K.S.A. § 33-205(a) (requiring present or imminent insolvency).

Plaintiff contends that multiple badges of fraud were present: "the transfers were to insiders; the transfers, collectively, comprised substantially all of the funds in [CMI's] [l]egal [t]rust [a]ccounts; [CMI] did not receive reasonably equivalent value for the funds disbursed; and [CMI] became insolvent as a result of its siphoning of funds." Doc. 146 at 39-40. If present, the badges apply to the actual fraud inquiry.

As to Plaintiff's claim of actual fraud, the uncontroverted evidence shows that the transfers to Cowboy MD were for Depew's commissions. The "transaction description" for each payment to Cowboy MD says "COMMISSION" OR "COMMISSIONS." Doc. 136-1 at 30-31. This is consistent with the testimony of both McAuley and Depew in deposition. The single transfer to Depew is described as "REIMBURSEMENT PER CMI." *Id.* at 35. Notably, Cowboy MD paid an amount into CMI's account that was more than the total of the four payouts.[8] And the badges of fraud Plaintiff cites assume that <u>all</u> transfers out of the legal trust funds are considered in evaluating whether they were fraudulent. But without a determination that Depew is the alter ego of CMI, consideration of all transfers is not appropriate. When these four transfers are considered alone, they do not carry any of the badges of fraud. They total less than $70,000 of the $4 million, or less than 2%.

---

[8]   The transfer to Depew was $4,500. The transfers to Cowboy MD totaled $63,940. Cowboy MD transferred $295,000 into account -0577.

As to Plaintiff's claim of constructive fraud, the uncontroverted evidence shows that Depew brought Plaintiff to CMI, suggesting he gave reasonably equivalent value for the commission amounts he received. Plaintiff contends that Depew has not shown how these payments were commissions, how they were calculated, and whether they were the "equivalent value" received by CMI. Doc. 158 at 18-19. But even if a reasonable jury could find the commissions were not an equivalent value of Depew's services, that does not make them fraudulent. If the matter is considered as one of actual fraud, it constitutes only one of the badges of fraud and cannot stand alone to create a triable issue as to actual fraud. And if the Court considers it as an argument for constructive fraud, Plaintiff is still missing both of the additional requirements under K.S.A. § 33-204(a)(2)(A) and (B). Plaintiff has not even addressed these requirements.

Plaintiff contends that every transfer that was not for gloves or that was not approved by Plaintiff was a fraudulent transfer. But this position conflates a fraud claim with a breach of contract claim. The terms and conditions of PO #1 stated that Plaintiff would provide disbursement instructions. And Roberts's email about account -8530 stated that the account would only be used "for Stan [Ross's] production deal." Transfers contrary to these representations may constitute a breach of contract. But a fraudulent transfer requires more. There is no dispute that Depew was largely responsible for CMI getting Plaintiff's business. And there is no dispute that CMI ordered some nitrile gloves. Plaintiff has not shown that the transfers to Depew and Cowboy MD were actually or constructively fraudulent. No reasonable jury could find that they were.

The uncontroverted evidence entitles Depew to summary judgment on this claim. Depew's motion is granted. Plaintiff's motion is denied.

## IV.    CONCLUSION

The Court concludes that no reasonable jury could find Depew to be the alter ego of CMI. This determination entitles Depew to summary judgment on all claims except the KUFTA claim. Plaintiff brings that claim against Depew as alter ego of CMI, but also against Depew for his own actions. But the uncontroverted evidence shows that Depew is not a transferor, transferee, or beneficiary under KUFTA. And there is no evidence from which a reasonable jury could find that the transfers directly to Depew and Cowboy MD were constructively or actually fraudulent. The Court grants Depew's motion and denies Plaintiff's as to Depew.

THE COURT THEREFORE ORDERS that Depew's motion for summary judgment (Doc. 143) is GRANTED. The Clerk's Office shall terminate him as a party in the case.

THE COURT FURTHER ORDERS Plaintiff's motion for summary judgment is DENIED with respect to Depew and TAKEN UNDER ADVISEMENT with respect to McAuley. The Court will address the claims against McAuley by separate order.

IT IS SO ORDERED.

Dated: May 17, 2024                                 /s/ Holly L. Teeter
                                                    HOLLY L. TEETER
                                                    UNITED STATES DISTRICT JUDGE